PARK v. NEW YORK, L. E. & W. R. CO.

FARMERS' LOAN & TRUST CO. v. SAME.

(Circuit Court, S. D. New York. September 5, 1895.)

1. CONTRACTS—INTERPRETATION—EXPRESS BUSINESS.

Prior to 1888 the express business of the E. R. R. was carried on by the E. Express Co. under a contract with the E. R. Co. On March 16, 1888, the W. Express Co. made a contract with the E. Express Co. by which it assumed the latter company's obligations under the contract with the railroad company, and immediately afterwards the W. Co. made a contract directly with the railroad company for the conduct of the express business. By this contract it was agreed that, in consideration of a percentage of the gross receipts of the express business, the railroad company would provide facilities for such business, and carry the express matter on its passenger trains, and that in case the amount of express matter should be too large to be conveniently carried on such trains, or if competition with other express companies should make it necessary, the railroad company would run special trains, so arranged as to enable the express company to compete with its rivals, and that, if the railroad company's percentage of the receipts from the business of such trains should be less than the cost of running the same, the express company should pay the difference. In a subsequent clause of the contract the railroad company agreed that it would keep its equipment and train service in such a state of efficiency as would enable the express company to compete successfully with its rivals. At the time this contract was executed, special express trains were being run each way between the termini of the road. Shortly after the making of the contract the railroad company presented bills to the express company for the expense of these trains in excess of the railroad company's receipts therefrom. The express company declined to pay the same, and, as part of a settlement of various differences, it was agreed that the bills should be withdrawn, and that the railroad company would continue running the trains without extra charge. Subsequently it became necessary, in order to enable the express company to compete with its rivals, to expedite the running of these trains. The length of the railroad between its termini, and the character of its road, were such that under equal conditions it could not make as good time as some of the competing lines, but it was conceded to be possible to make the service on the special express trains better than it was. *Held*, that the general provisions of that part of the contract which required the railroad company to maintain such a train service as to enable the express company to compete with its rivals were controlled by the specific provisions relating to special express trains, and payment of the extra cost thereof by the express company;

that the subsequent agreement of settlement did not absolve the express company from obligation to pay for all further improvement in the train service which might become necessary; and that the railroad company was not bound to expedite the service of the special express trains, except upon payment of the increased cost by the express company.

2. SAME.

The contract between the railroad company and the W. Express Co. provided that it should apply to certain named lines of road, and to all others which the E. R. Co. should lease, operate, or control, or over which it should have running arrangements. The E. R. Co. owned stock of, and had running arrangements with, another road, which had also a separate contract with the E. Express Co., which was assigned to the W. Express Co. at the time its contract with the E. R. Co. was made, and was recognized by the latter as existing. *Held,* that the fact that such road would, at the expiration of its special contract, come under the terms of the E. R. Co.'s contract, as a controlled road, did not make the E. R. Co. responsible for violations thereof occurring during its continuance.

Frederic B. Jennings, for the motion.
Allan McCulloh, opposed.

LACOMBE, Circuit Judge. This is an application by the receivers of the New York, Lake Erie & Western Railroad Company (hereinafter called the "Erie Railroad Company") for instructions relative to a contract made between the company and Wells-Fargo Company on March 16, 1888, for the conduct of an express business over the lines of the railroad company. Under the terms of this contract the express company agreed to pay to the railroad company 40 per cent. of the entire gross earnings received from the operation of the express business over the lines covered by the contract. On the same day (March 16, 1888) a further contract was made, the two contracts being parts of the same transaction, whereby the express company guarantied that the proportion of gross earnings to be paid to the railroad company under the first-named contract should amount to not less than $500,000 a year; that is to say, $41,666.66 a month. For the months of July, 1894, to February, 1895, inclusive, the express company has not paid the full amount of the minimum guaranty for which provision is made in the contract above referred to. The whole amount claimed for said months is $333,333.28, of which the sum of $296,542.59 has been paid, leaving a balance claimed by the receivers amounting to $36,790.69, wherefore the receivers ask the instructions of the court. The relations of the two companies always have been, and, despite existing differences, are, amicable; and by arrangement between counsel the express company has answered the petition of receivers, and been heard upon the application, apparently with the expectation that upon the court's construing the contract all differences between the parties to it can be mutually adjusted without litigation. The express company has paid to the receivers the full 40 per cent. of the gross earnings provided for, which, however, did not amount to the minimum guaranty. It has declined to make further payments on account of said eight months, to offset losses which it has sustained by reason, as it contends, of the failure of the railroad company and the receivers to perform the terms

of the contract upon their part. The affidavits contain many statements of facts which are controverted, and are largely taken up with averments on one side, and explanations or contradictions on the other, of general defective and inefficient service furnished by the receivers. The argument, however, was confined to the two main averments hereinafter set forth, as to which there is no dispute as to the facts. Upon these, and upon these only, can the court undertake to express an opinion. Disputed questions of fact may best be disposed of otherwise than upon affidavits, and, when the main points of difference are settled by a construction of the contract accepted by both parties, these minor contentions will no doubt be adjusted without the intervention of the court.

The main grounds upon which the express company resists the claim of the receivers are these: (1) Loss of business arising from the refusal of the receivers to expedite the train service over the lines of the railroad. (2) Losses arising by reason of the strike at Chicago in the summer of 1894.

Inasmuch as the several contracts between the companies must be construed in the light of the surrounding circumstances, a somewhat full review of the facts is necessary.

Prior to 1888 the express business of the railroad was transacted, under contract with the railroad company, by the Erie Express Company, which also had a contract with the Chicago & Atlantic Railroad Company, dated May 15, 1887, the two roads making together a continuous line from New York to Chicago. This contract between the Erie Express and the Chicago & Atlantic contained explicit and comprehensive provisions as to the character of service to be rendered, and the manner in which the business should be conducted, and reserved to the Chicago & Atlantic, as consideration for the rights and privileges and facilities thereby granted, 40 per cent. of the gross earnings of the express company for the distance carried over the Chicago & Atlantic Railway. This contract was to continue in force for 10 years, and thereafter, unless and until terminated by 60 days' notice in writing. It contained a clause providing that in case the New York, Lake Erie & Western Railroad Company should contract with any other express company (than the Erie Express Company) for the conduct of express business over its line, the Erie Express Company should have the right to assign its contract with the Chicago & Atlantic to such other express company, which should have and enjoy all the rights and privileges, and be subject to all the covenants and conditions, therein provided to be enjoyed and performed by the Erie Express; it being "mutually understood and agreed that, in case such assignment is made, it shall be upon condition that the company to which said assignment is made shall agree that from and after the date of such assignment the minimum sum to be paid the railway company hereunder by such company shall be $36,000 per year." The terms of the contract of the Erie Railroad Company with the Erie Express Company do not appear, nor does the date of its expiration. On March 16, 1888, the Erie Express Company executed a written agreement with the Wells-Fargo Com-

pany, whereby, in consideration of the assumption by Wells-Fargo Company of all the obligations imposed upon the Erie Express Company by the contract of May 15, 1887, with the Chicago & Atlantic, and of payment of the full value of the Erie Express Company's plant, it assigned to Wells, Fargo & Co. its good will and plant, and also the contract with the Chicago & Atlantic Railway Company, "* * * and also all its rights, title, and interest in and to all other contracts, agreements," etc., "* * * under or by virtue of which it carried on the express business on the lines of New York, Lake Erie & Western Railroad Company, the Chicago & Atlantic Railway Company, and any and all other lines of railroad whatsoever." Assuming the contract between the Erie Express Company and the Erie Railroad Company to be assignable, this last-quoted agreement transferred its privileges and obligations to the Wells-Fargo Company; but, instead of continuing to operate under the older contract, Wells-Fargo Company itself entered into the new contracts with the Erie Railroad which now call for construction. No such new contracts were made by Wells-Fargo Company with the Chicago & Atlantic, but it continued operations on that railroad under the contract assigned to it by the Erie Express Company. Subsequently the Chicago & Atlantic was sold out under foreclosure, and bought by a new corporation, called the Chicago & Erie Railroad Company; but so far as appears the contract of May, 1887, which has not expired by its own limitation, was never abrogated by the original parties or their successors in interest, and, in the absence of further information as to proceedings in foreclosure, must be presumed to bind the successors of the Chicago & Atlantic, and to be still in force. Certainly the papers show that it has been treated by both parties to the present controversy as being in force subsequently to the sale in foreclosure, and the acquisition of the road of the Chicago & Atlantic by the Chicago & Erie. The terms of the contract of March 16, 1888, are as follows: By the first clause the Erie Railroad Company agrees:

"First. To provide on each of its daily passenger trains sufficient facilities of the kind customarily furnished to express companies by railroad companies for the transportation of all freight and express matter which may be tendered by the express company to the railroad company, at any station at which passenger trains may stop, and to receive and transport such freight and express matter upon such passenger trains leaving such station next following such tender, and to carry and deliver the same without detention. And said railroad company further agrees that in case the amount of freight and express matter so tendered for transportation by said express company shall be in excess of the amount that can conveniently be carried upon the regular passenger trains of said railroad company, or if competition with other express companies shall make it necessary in order to enable said express company to retain its due and fair share of the express business between any points on said lines, the railroad company will run special express trains between such points, leaving and arriving at such time as will enable the express company to compete for business with express companies having similar trains run over railroads upon which such other companies may be doing an express business. If the shares of the earnings of such special express train accruing to the railroad company at the rate hereinafter fixed shall be less than the actual cost of running such train, then the express company shall pay to said railroad company the dif-

ference between such earnings and such actual cost. * * * The lines of
road to which this contract shall be applicable are given, together with their
respective mileages, in the schedule hereunto attached. And the said railroad
company hereby further agrees that, in addition to the lines mentioned in
said schedule, this contract shall include any and all other lines of road which
it may lease, operate, or control, or over which it shall have running arrange-
ments, during the existence of this contract."

The line of Chicago & Atlantic (now Chicago & Erie) is not in-
cluded in the schedule annexed to the contract.

By the second clause the express company agrees to pay to the
railroad company 40 per cent. of the entire gross earnings received
by it in the operation of the express business on said lines included
in said schedule, or afterwards acquired in the manner above
stated. Succeeding clauses provide in detail for manner of pay-
ment; for the carrying of safes, of express messengers and guards;
for lighting and heating; for telegrams for agents; for damage
claims, and other matters not germane to the question now under
discussion. The thirteenth clause provides as follows:

"Thirteenth. It is the intention of this contract to make the operation of
the express business over the lines herein mentioned mutually advantageous
to the railroad company and express company; and it is understood and agreed
that the railroad company shall, to the extent of its ability, assist the express
company in acquiring traffic, and also in securing connections, arrangements,
and contracts with other railroads and transportation companies. And the
railroad company hereby agrees that it will, during the existence of this con-
tract, keep and maintain its equipment, and will keep its train service in
such a state of efficiency as will enable the express company to successfully
compete with express companies doing business over the lines competitive
to the lines covered by this contract, and the express company will, to the
extent of its ability, assist the railroad company in securing freight and
passenger business; and it is agreed and understood that the express company
shall not make contracts with lines competitive with said railroad company for
the transaction of an express business, except upon consultation with and ap-
proval of the railroad company, and except, further, in case railroad com-
panies with which the express company has contracts covering after-acquired
lines should, by extension, lease, or trackage arrangements, become competitive
with said railroad company. It is further agreed and understood that the express
company will forward by the lines of the railroad company all its business,
foreign and domestic, for points east of Chicago, reached by said lines of said
railroad or its connections, and, in like manner, will send all its west-bound
matter originating east of Chicago by way of said lines, except as hereinabove
provided. But this provision shall not be construed to compel the express
company to use the lines of the railroad company for through business be-
tween New York and Chicago, if, by reason of the expiration or determina-
tion of the contracts now existing, or the failure or inability of the railroad
company to secure another route, the express company should lose the right
to do the express business between the western terminus of the lines of the
railroad company and Chicago."

The collateral contract of March 16, 1888, between the same par-
ties, guaranties the payment by Wells-Fargo Company to the Erie
Railroad of $500,000 in cash, as a further consideration for entering
into the main contract, and that the proportion of gross earnings
to be paid under its provisions "shall amount to not less than
$500,000 yearly for the lines included in the schedule attached to
said contract."

At the time these contracts were made, two special express
trains (Nos. 13 and 14) were being run one each way between New

York and Chicago. Apparently, the service by these two trains has since been improved, but still greater improvements in the service of similar trains run on other roads prevent the express company from competing successfully with other express companies using those roads. It is conceded that it is possible to further expedite the service by Nos. 13 and 14, and the receivers state that they are willing so to do, if repaid the additional expense to the railroad of such improvements. As before stated, the question of a right under the contract to quicker service by those trains only will be discussed. It was a fact well known, of course, to both parties, when the contract was entered into, that the distance from New York to Chicago was greater by the Erie and Chicago & Erie than by competing roads, and made still greater running time, by reason of more difficult grades and curves; and that fact should not be lost sight of in construing the thirteenth clause, above quoted. It must have been fully understood by both parties that if all the railroads running from New York to Chicago maintained their lines in the highest state of perfection, used the very best engines, cars, equipment, and appliances known to the art, and arranged for the running of their trains with the greatest skill as to adjustment of loads, hours of departure, etc., it would not be possible for the Erie to make as quick time between the two termini as could be made by a shorter line. The provision in that clause for a train service in such a state of efficiency as will enable the express company to successfully compete, etc., while calling for a service relatively the best, certainly does not mean that the railroad shall accomplish the impossible, by maintaining a service better than the best. The present service by trains 13 and 14, however, is concededly not the best practicable, and should be improved, and the only question now to be decided is whether the additional cost of expediting these trains should be borne by the railroad or the express company. If the thirteenth clause stood alone, the railroad company might fairly be required to improve this service at its own expense; for that clause calls for an express service unlimited, by the exigencies of the other business, freight and passenger, carried on by the railroad company. But the phraseology of the thirteenth clause is general, while that of the first clause is specific; and though both are to be construed together, and all clauses of the contract to be given effect according to the fair import of its language, if there be inconsistency between general and specific provisions the latter will control, to the extent, at least, that they are plainly specific. These two trains are specifically provided for in the latter half of the first clause as "special express trains," and whatever improvements may be required to bring up the service of those trains to the standard prescribed in such first clause, or even in the thirteenth or general clause, it is expressly provided that the difference between what the railroad company earns by running them, and the cost of so running them, shall be paid by the express company. It would be unwise, in advance of such improvements in the service of these two trains as the receivers offer to make, to

express an opinion as to the precise degree of efficiency which the contract entitles the express company to exact, but that the increased cost of securing such efficiency, if any "special express trains" such as the first clause calls for, shall be borne by the express company, is a plain requirement of the contracts of March 16, 1888.

It further appears that, not long after the making of this contract, the railroad company presented bills to the express company for the difference between the earnings and the actual cost of running said two trains, which, as was said before, had been regularly run on the road during the time of the Erie Express Company. The Wells-Fargo Company declined to pay, and that claim, with other differences arising between the companies, was adjusted by a further contract dated November 1, 1889. That contract recites that questions have arisen between the parties as to the true meaning and construction of certain clauses of the two agreements (the main contract and the contract of guaranty) entered into March 16, 1888, which differences the contract of November 1, 1889, is to harmonize. It provides that for a limited period the minimum guarantied shall be $450,000, instead of $500,000; manifestly not an agreement as to the meaning of the former contract, but a distinct modification of its terms. It contains further provisions as to sharing the loss or damage sustained by an accident at Shohola; as to the express company's maintaining an accounting department; as to the transportation of milk, garden, or other products; and as to the interpretation to be given to the seventh paragraph of the main contract. Its second clause reads as follows:

"Second. The railroad company agrees to withdraw the bill which it has rendered against the express company for the difference between the earnings and actual cost of running trains between New York and Chicago now known as trains 'Nos. 13 and 14,' and will continue them, or a similar service, making no charge for the same."

This paragraph undoubtedly modified the original contract so as to require the railroad company to continue the two special express trains which it had put on the road before the Wells-Fargo Company succeeded the Erie Express, and to run them so as to furnish service similar to that already afforded by them, without any charge to the express company. But it would be too broad a construction of the contract of November 1, 1889, to hold that the railroad company thereby assumed the obligation of expediting and improving the service of those two trains, to an unlimited extent, entirely at the cost of the railroad company, no matter how great that cost might be. It would need much plainer language than is here employed to warrant such a construction.

The other question to be decided on this application is whether the express company may offset against the claim now presented its losses sustained in consequence of interruption to business or diminution of earnings arising by reason of the strike in Chicago in the summer of 1894. It seems from the affidavits that such interruption as there was in consequence of the strike occurred on

the line of the Chicago & Erie. The application of a similar rule of interpretation to that already employed disposes of this question. Assuming that either by reason of the Erie Railroad's ownership of the stock of the Chicago & Erie, or because of its having running arrangements with the latter road, the line of the Chicago & Erie would come within the general enumeration at the close of paragraph 1 of the contract of March 16, 1888, the mutual rights and obligations of the parties are still to be determined by the specific and exclusive contract of 1887, which makes special provision for the express business to be carried on upon the line of the Chicago & Erie. That contract was never abrogated by the original parties to it. It was continued in force by express assumption of its obligations upon the assignment to Wells-Fargo Company, which was executed on the same day as the contract of March 16, 1888, with the Erie Railroad. Its burdens have been assumed and discharged by the Chicago & Erie, and it has not been terminated by the circumstance that subsequent arrangements between the Chicago & Erie and the Erie Railroad are such that, upon the expiration of the special contract for the former line, the Wells-Fargo Company might be entitled to demand service from it under the general contract for lines not enumerated in the schedule. The terms of the contract of guaranty seem to indicate that such was the intention of the parties, for the $500,000 as minimum of receipts guarantied is restricted to the lines enumerated in the schedule attached to the contract of March 16, 1888, which does not include the line now operated by the Chicago & Erie. Evidently there was no intention to abrogate the special contract which already provided for a minimum from that line in advance of its expiration under its own terms. All questions, therefore, as to liability for losses by reason of strikes sustained on the line of the Chicago & Erie, should be left to be determined between that road and the Wells-Fargo Company. The receivers, therefore, are instructed that, so far as appears, neither the failure to expedite the trains 13 and 14 so long as Wells-Fargo Company declines to pay the extra costs, nor the losses sustained by the strike, are an answer or offset to their claim for the guaranteed minimum. No opinion, however, is expressed as to the disputed questions of fact, which deal with service other than that by "special express trains."